IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JANE DOE,

                Plaintiff,                      OPINION AND ORDER

    v.

                                                  19-cv-169-wmc

BOARD OF REGENTS FOR THE
UNIVERSITY OF WISCONSIN SYSTEM,

                Defendant.

---

       In the summer of 2018, plaintiff Jane Doe attended a college-access program run by the University of Wisconsin-Madison for eighth through twelfth graders. During a field trip to a local pool, another high school student, who will be referred to in this opinion as "M,"[1] touched Doe's buttocks several times, as well as grabbed her around the waist, stomach, and thighs -- all without Doe's consent. Two days later, while Doe was laying on a friend's bed in a dorm room, M also jumped on top of Doe, restrained her wrists for 15-20 seconds, and after releasing her, put a sticker on Doe's shorts over her buttocks. The day after Doe complained about these events to staff, the University suspended M from the summer program and sent her home. By the summer of 2019, Doe herself had also been removed from the program due to poor academics during the school year, which she attributes to the emotional trauma of M's misconduct.

       In this lawsuit, plaintiff claims that the Board of Regents for the University of Wisconsin System's failure to respond adequately to M's past harassment of other students effectively deprived Doe of educational opportunities in violation of Title IX. Before the court is defendant's motion for summary judgment (dkt. #14), which will be granted for the reasons explained below.

---

[1] All of the students involved in this case, including Doe and M, as well as "Z" and Z's girlfriend, were underage girls at the time of the incidents referred to in this opinion and, therefore, they will all be referred to by pseudonyms or an initial.

UNDISPUTED FACTS[2]

### A. PEOPLE Program

The Precollege Enrichment Opportunity Program for Learning Excellence ("PEOPLE") Program is a college-access program headquartered at the University of Wisconsin-Madison ("UW-Madison"). The purpose of the PEOPLE Program is to help high school age students prepare to be viable college candidates. Among other conditions, students are required to maintain a cumulative 2.75 grade point average in order to continue participating in the program.

During the summer, the program runs the "PEOPLE Summer University," which is designed to expose students to a college-like experience first-hand. Students in the Summer University program stay in dorms on the UW-Madison campus, take classes, and participate in extracurricular activities. Both plaintiff Jane Doe and M attended the PEOPLE Summer University in 2017 and 2018, although they did not meet until the summer of 2018.

### B. 2017 Summer University Events

In 2017, Dartaja Carr -- a PEOPLE Program "residential mentor" -- had learned that M was "touchy-feely" and was instigating problems with other students, including being "manipulative." That summer, M was also "having some drama" with another PEOPLE Program student, "Z," and her girlfriend. Specifically, M had posted a picture of herself and Z on Snapchat, which prompted Z's girlfriend to confront Z. Apparently in response, Z gave M's phone number to her girlfriend, and they began arguing over Snapchat. At some point during the summer of 2017, M also tried to hold Z's hand. In addition to Z's complaints, approximately three other students complained about M being in the middle of this same "gossip." (*See* Pl.'s PFOF (dkt. #31)

---

[2] These facts are drawn from the parties' proposed findings and facts and deemed material and undisputed for the purposes of summary judgment, unless otherwise indicated.

¶ 96; Hunter Dep. (dkt. #21) 91:2-25.)

Later that same summer, University Pre-college Advisor Sarita Foster and Program Manager Kia Hunter received an Information Services Form ("ISF") about M over these incidents.[3] After Hunter received the ISF, she spoke with both Z and M separately. In speaking with M in particular, Hunter explained that Z was uncomfortable with both her social media contact and attempt at hand-holding. After her discussions with M and Z, Hunter also informed their residential mentors that the two girls were not to have any further contact with one another. This was the only disciplinary action taken in response to the 2017 ISF complaint, although Hunter warned M that if her name were to come back across her desk, there would be more severe consequences.

As further evidence of M's 20*17* misconduct, plaintiff points to a 2018 ISF report written by Residential Mentor Carr, stating: "Today, I was informed that M was feeling on another student's butt while at Goodman Pool. M also did this last year." (Pl.'s PFOF (dkt. #31) ¶¶ 70, 121.) While defendant objects to plaintiff's use of this evidence on hearsay grounds, the statement may be admitted to show Carr's *knowledge* of that harassment. *See Franchina v. City of Providence*, 881 F.3d 32, 50 (1st Cir. 2018) (out-of-court statements admissible for purpose of demonstrating that defendant knew or should have known of alleged harassment). [4]

---

[3] Plaintiff concedes that she does not have evidence to dispute this fact, (*see* Def.'s PFOF (dkt. #32) ¶ 41), however, she points out that this 2017 ISF could not be located because the PEOPLE Program had an informal policy of shredding ISFs each year to ensure that sensitive student information was not released (Pl.'s PFOF (dkt. #31) 134). Thus, this proposed fact is based not on the form itself, but rather Foster's and Hunter's deposition testimony. (*See* Def.'s PFOF (dkt. #32) ¶¶ 41-42.)

[4] To the extent that plaintiff intended to use the ISF report for the truth of the matter asserted -- that M felt another student's butt in 2017 -- the court sustains defendant's objection. *See* Fed. Rule of Evidence 801 (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted). While the Federal Rules of Evidence exempt certain business records from the hearsay rule, to fall under this exception, the record must have been made "at or near the time by" the act recorded, Fed. Rule of Evidence 803(6)(A), and the statement "M also did this last year" was written one year after M's alleged misconduct. Accordingly, Carr was not recording her recollection "at or near the time" of M's alleged act, and so the statement does not fall under the business records exception.

Plaintiff also references another document created in 20*18* as evidence of M's 2017 misconduct; namely, a "Case Supplemental Report" written by Peter Grimyser, a Detective at the University of Wisconsin Police Department. (Pl.'s PFOF (dkt. #31) ¶ 155.) In July of 2018, Grimyser interviewed Foster, after which he recorded in his report that:

> Sarita Foster told me last summer [M] had gotten into trouble for "sexual harassment, touching other women in their intimate parts and inappropriate talking" that two female students had come forward to make reports (including one who claimed that she touched her on her buttocks).
> Sarita Foster said that [she] had similar issues with [M] this summer.

(Simcox Decl., Ex. 3 (dkt. #15-3) 11; Pl.'s PFOF (dkt. #31) ¶ 70.) Foster, in her deposition in this case, testified that she had been misquoted and, after seeing the report, she complained about the error to Cheryl Gittens, a Vice Provost at UW-Madison. (Def.'s PFOF (dkt. #32) ¶ 105 (citing Foster Dep. (dkt. #19) 84:20-25.)[5] Grimyser, for his part, testified in his deposition that his report accurately recorded what Foster told him. (Pl.'s PFOF (dkt. #31) ¶ 154 (citing Grimyser Dep. (dkt. #20) 21:9-22:12.)

As with the Carr report, the Grimyser report is not admissible for the proof of the underlying matter asserted -- that M had harassed and non-consensually touched students in 2017. *See* Fed. Rule of Evidence 801; *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) ("[T]hird-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility."). Moreover, because the report contains two levels of hearsay -- it is Grimyser's written, out-of-court statement recording Foster's out-of-court statement -- is not admissible even to show defendant's knowledge of the alleged harassment. In a similar case, the Seventh

---

[5] Specifically, Foster explained that "[t]he information in the beginning, 'Sarita told me last summer,' that is incorrect. . . . I did tell him about the sexual harassment, touching a woman in their intimate parts and inappropriate talking. That quote is correct. But it didn't happen last summer, being summer of 2017. That would have happened in summer of 2018." (Foster Dep. (dkt. #19) 108:20-109:3.)

4

Circuit rejected the admissibility of an assistant principal's notes taken during interviews of students and parents as a part of a Title IX investigation. *See Davis v. Carmel Clay Sch.*, 570 F. App'x 602, 605-06 (7th Cir. 2014). The court concluded that even if the notes themselves were admissible under the business records exception, the statements of the students and parents contained within the notes would not be admissible and, therefore, could not be considered even as evidence of the school's knowledge of the alleged violations. *Id.*

However, plaintiff partially makes up for this evidentiary problem by offering Grimyser's deposition testimony. (*See* Pl.'s PFOF (dkt. #31) ¶¶ 152-55.) While arguably vague, Grimyser testified under oath that Foster told him that M also got into trouble for sexual harassment in 2017 by touching other women in their intimate parts, touching one student on her buttocks, and inappropriate talking.[6] Plaintiff does not attempt to use this testimony to prove the underlying truth of the matter asserted -- M's 2017 misconduct -- but rather as evidence of what Foster told Grimyser. (*See id.*) This is permissible, as it is not hearsay and is relevant to show Foster's knowledge of M's misconduct. In response, defendant does not challenge the admissibility of this evidence for proof of knowledge, but rather points again to Foster's testimony that she was misquoted, merely establishing a dispute of fact not negating Grimyser's testimony. (*See id.*)

---

[6] The deposition transcript includes the following exchange:
>Q . . . The second paragraph states, "Sarita Foster told me last summer M had gotten into trouble for," quote, "Sexual harassment, touching other women in their intimate parts and inappropriate talking," end quote, "That two female students had come forward to make reports (including one who claimed she touched her on her buttocks)." Do you see that paragraph?
>A I do.
>Q And the last summer would have been the summer of 2017; is that right?
>A Correct.
>Q And you put sexual harassment, touching other women in their intimate parts and inappropriate talking in quotes. Is that because those were the actual words that Sarita Foster used?
>A Yes.

(Grimyser Dep. (dkt. #20) 21:9-25.)

### C. 2018 Summer University Events

In preparation for the 2018 Summer University Program, Foster -- who by that time held the position of Program Coordinator and was in charge of all female housing -- assigned M and Z to different resident mentors because of the 2017 complaints. Despite having different resident mentors, M and Z were in the same afternoon classes in 2018, and M would apparently touch Z's arm or shoulders or whisper things into her ear on the way to or on the way back from class. The parties do not dispute that, at some point, Z complained to her Residential Mentor, who was again Carr, about this behavior, but they do not agree on *when* Z voiced her complaint, as will be discussed in greater detail below.

On June 23, 2018, a group of PEOPLE Program students, including Doe and M, went on a field trip to a local pool. While at the pool, M touched Doe on her buttocks several times without her consent. After Doe told M to stop, she then grabbed Doe around the waist, stomach, and thighs. Both times when M touched Doe, the lower half of Doe's body was underwater. As a result, no one else witnessed the touching, although a PEOPLE Program staff member was on the trip. At the time, Doe did not say anything to anyone about M's repeated touching.

Two days later, on June 25, 2018, Doe was visiting a friend in a dorm room. While Doe was lying on her friend's bed with the door open, M entered the room, jumped on top of Doe, and restrained her wrists, not letting her get up. Doe asked M to let her up several times, but M continued to hold Doe down for about 15 to 20 seconds. Doe then complained that M was hurting her, at which point M released her and sat down in a nearby chair. Shortly afterwards, M put a sticker on Doe's shorts over her buttocks without her consent.

That same night, Doe complained to her mentor Carr about M's conduct, both in the dorm room and earlier at the swimming pool, and Carr completed an ISF detailing Doe's complaints, which she then submitted around 10 p.m. that same night -- June 25, 2018. In that same ISF, Carr also recounted Z's complaints about M's behavior, including that M had tried to hold Z's hand,

6

whispered sexual phrases in her ear, and posted on social media.

As noted, although the parties agree that *Doe* did not complain to anyone about M's misconduct until she spoke with Carr on June 25, the parties dispute when Carr -- or any other PEOPLE Program staff person -- came to know of M's 2018 conduct towards Z. Pointing to Carr's deposition, defendant maintains she first received a complaint from Z on approximately June 23 that M was making her "uncomfortable." Carr also testified that Z's first complaint was only that M was (1) posting pictures of her and Z on social media and (2) calling her "Boo or Bae or things like that." In particular, Carr testified that it was not until later that she also learned M actually tried to touch Z and hold her hand, and when she ultimately learned that information, she decided to write the ISF to include both Z's and Doe's allegations.

In contrast, plaintiff asserts that Carr learned about Z's complaints much earlier, pointing to the statement in Detective Grimyser's July 16, 2018, report that Z had complained to Carr during the first week of camp -- the week of June 11th -- and her complaint included that M had been trying to hold Z's hand without her permission, was making sexually inappropriate comments, and made her uncomfortable. Further muddying the evidence is the fact that Carr's June 25th ISF states that she was informed of M's conduct towards Z "last week" -- the week of June 18th.

Regardless, the parties agree no action was not taken by any PEOPLE Program staff member regarding M's 2018 actions towards Z until after Carr wrote the ISF on June 25. Specifically, Program Coordinator Foster received Carr's ISF the following day, June 26, and first met with Doe around lunchtime that day to discuss the reported incidents in the ISF with her directly. She then met with Z, who told Foster that she wanted M's behavior to stop, but was uncomfortable telling M herself because she did not want to hurt M's feelings. Finally, Foster met with M on the 26th. During the meeting, Foster told M that: (1) this was a serious issue; (2) M would need to meet with Program Manager Hunter; and (3) she was required to wait in

7

Foster's office while Hunter was contacted. For her part, M denied touching Doe and any other wrongdoing.

After her meetings with all three girls, Foster also completed her own ISF, detailing those conversations and submitted it to Program Manager Hunter. Hunter reviewed both Foster's and Carr's ISFs, then still on the afternoon of June 26, Hunter met with M and advised that she would be removed from the program. During that same meeting, Hunter called M's mother and informed her that M was being removed from the PEOPLE Program Summer University. After packing up her things, M then waited in Foster's office until her mother picked her up sometime during the evening of June 26, 2018. Finally, Hunter wrote in a "follow-up" note to Foster's ISF that she "had a conference with M and explained how her actions were making other[s] feel and about respecting others['] personal space. . . . Because students complained about M in this capacity before, I called M's mom and told her M had to leave the program this summer." (Pl.'s PFOF (dkt. #31) ¶ 140; Kinne Decl., Ex. 2 (dkt. #15-2) 1.)

At some point during the events of June 26, Doe saw M one final time. M apparently grabbed Doe's shoulders while she was sitting in the dining hall and asked if Doe had told anybody that M had done something to her. At that time, Doe told M that she had not, and M walked away.

On July 16, 2018, the UW-Madison Police Department assigned Detective Peter Grimyser to investigate a complaint of sexual assault initiated by Doe's mother. As part of his investigation, Grimyser interviewed multiple witnesses, including Carr, Foster, and Doe, and at its conclusion, he forwarded his findings to the Dane County District Attorney's Office, who charged M with Fourth Degree Sexual Assault. Upon learning that M had been charged, the PEOPLE Program dismissed her from the entirety of the program, not just the 2018 Summer University.

Doe herself continued in the PEOPLE Program through 2019, but she was eventually dismissed because of her academics. Specifically, during the 2016-17 academic year, Doe had a

8

cumulative GPA of 2.92, but received a GPA of 2.67 her first semester.  Because of this academic performance, she received an "Academic Watch Letter" from the PEOPLE Program in September of 2017, indicating that she was being placed on the "watch list" due to her grades and would be placed on "academic probation" if her GPA fell below 2.75.  Worse, in the spring 2018 semester, before any interaction between Doe and M, she earned a 2.57 GPA, putting her on academic probation.

After the events at the 2018 PEOPLE Summer University, Doe once again earned a 2.57 GPA that fall and was placed on "Strict Academic Probation," meaning she was told by the PEOPLE Program in a January 2019 letter that she would need to achieve a 3.0 GPA during the Spring 2019 academic year to remain in the program.  Unfortunately, Doe received a 2.46 GPA for the Spring 2019 semester and was removed from the program for failure to meet its academic requirements.  Since the summer of 2018, Doe reports continued anxiety attacks because of her incidents with M, and she started seeing a therapist after being dropped from the PEOPLE Program.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Consistent with the factual summary above, the court will view all facts and draw all reasonable inferences in the light most favorable to plaintiff as the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Moreover, in *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the U.S. Supreme Court held recipients of federal funds can, "in

9

certain limited circumstances," be liable for damages under Title IX in cases of peer-on-peer harassment. *Id.* at 643. However, as the Seventh Circuit has since explained, "[t]he Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable" for such harassment. *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). Specifically, the *Davis* Court established that liability may only be found where: (1) "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities"; and (2) the "harassment . . . is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

As to the latter requirement, whether conduct is so severe, pervasive, and objectively offensive as to trigger Title IX liability "depends on a constellation of surrounding circumstances, expectations, and relationships." *Chivers v. Cent. Noble Cmty. Sch.,* 423 F. Supp. 2d 835, 847 (N.D. Ind. 2006) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). In particular, "young children are still in the process of learning appropriate behavior and 'may regularly interact in a manner that would be unacceptable among adults.'" *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 651). The touchstone of this requirement is that the harassment "must be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003). "The harassment must have a 'concrete, negative effect' on the victim's education." *Gabrielle M.*, 315 F.3d at 823. "Examples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Id.* (internal citations omitted).

Here, it is undisputed that M touched plaintiff Doe's buttocks, waist, stomach, and thighs while at the pool, and she later jumped on top of Doe in a dorm bed, pinning her down by restraining her wrists for up to 20 seconds. Moreover, even after releasing her, M slapped a

10

sticker on the bottom side of her shorts. While Doe had already been on academic notice, her grades did plateau and then drop after the events of the summer of 2018, ultimately causing her to be removed from the PEOPLE Program. Doe also claims to experience anxiety attacks because of the incidents with M. Although the legal standard sets a high bar, given the fact-specific nature of the inquiry, the court will assume for purposes of summary judgment that a reasonable jury could find M's misconduct was sufficiently severe to trigger Title IX liability.

Assuming without deciding that plaintiff has created a triable issue regarding the seriousness of the harassment, however, plaintiff's claim still fails under the first requirement because no reasonable jury could find that defendant was deliberately indifferent to M's known misconduct. First, there is no dispute that before M's harassment of Doe the PEOPLE Program staff knew the following events had occurred in 2017: (1) M, Z, and Z's girlfriend had gotten into a dispute over social media; (2) M tried to hold Z's hand; (3) approximately three other students complained about M being in the middle of "[s]he said/she said gossip"; and (4) M was "touchy-feely," instigating problems with and being manipulative towards other students. Plaintiff has produced no other admissible evidence regarding M's actual misconduct in 2017, although she has produced a little more evidence regarding staff's *knowledge* of M's misconduct. Construing the disputed and admittedly vague evidence in plaintiff's favor for purposes of summary judgment, plaintiff has shown: (1) Foster knew that M had gotten into trouble in 2017 for sexual harassment, touching other women in their intimate parts, touching one student on her buttocks, and inappropriate talking; and (2) Carr knew that M had felt another student's buttocks in 2017. Moreover, in response to this information, University Program Manager Hunter met separately with M in 2017, explaining that her conduct made Z uncomfortable and expressly warning that if her name came across Hunter's desk again, there would be more "severe consequences." At that time, Hunter also instructed residential mentors that M and Z were not to have any contact with one another. Finally, Foster ensured that for the 2018 program, M and Z would have

11

different residential mentors.

As for M's 2018 misconduct, it is undisputed that Manager Hunter did not learn of M's actions towards Doe until the night of June 25, 2018. There is some conflicting evidence regarding when staff learned of M's continued 2018 misconduct towards Z, but considering the evidence in plaintiff's favor, Carr was put on notice sometime during the first week of camp -- June 11-18. Specifically, and again construing the disputed evidence in plaintiff's favor, Residential Mentor Carr knew the same week that M had been trying to hold Z's hand without her permission, was making sexually inappropriate comments, and made Z uncomfortable. Still, it is undisputed that on the same day that Doe complained Carr completed an ISF, which was escalated to Hunter the next day. Moreover, the same day she received the ISF, Hunter both investigated the allegations and suspended M from further participation in the PEOPLE Program Summer University.

On these facts, plaintiff's Title IX claim falls for at least two, independent reasons. *First*, deliberate indifference may only be found based on a recipient's action (or inaction) to "*known* acts," a threshold requirement of which is proof of the recipient's "actual knowledge" of the harassment. *Davis,* 526 U.S. at 647-48 (emphasis added). While a recipient need not possess actual knowledge of harassment directed "at a *particular plaintiff*," it "must still have actual knowledge of misconduct that would create risks 'so great that they are almost certain to materialize if nothing is done.'" *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 605-06 (7th Cir. 2008) (emphasis in original). Thus, for example, if an individual is known to be a "serial harasser," a recipient may be found to have actual knowledge of that individual's misconduct and the attendant risk posed to other students. *See id.* at 606; *Doe I & II v. Bd. of Educ. of Chi.,* 364 F. Supp. 3d 849, 861 (N.D. Ill. 2019).

Here, plaintiff has at most shown that M actually engaged in misconduct towards one other individual, Z, which appeared in the context of a specific social dispute between the girls.

Whatever suggestion there may be by plaintiff that defendant had actual knowledge of other victims beyond Z and Doe, such a finding would amount to rank speculation on this record. Certainly, with the benefit of hindsight, M's misconduct towards Z presented more serious red flags than they apparently appeared to the decisionmaker, Hunter, and her staff, but the facts in this case are a far cry from those in which "serial harassers" have been found to have put a defendant on notice of a risk of almost certain harassment to others. *See Doe I & II*, 364 F. Supp. at 862 (denying defendant's motion to dismiss Title IX complaint where plaintiff alleged that Board had actual knowledge of teacher's numerous complaints of sexual harassment and physical abuse of students over 15 years); *Doe 4 v. Freeburg Cmty. Consol. Sch. Dist. No. 70*, 279 F.Supp.3d 807, 814 (S.D. Ill. 2017) (holding that, as a matter of law, School District had actual notice that teacher posed an almost certain risk to plaintiff where at least five male students had previously informed the District that they were sexually abused by a teacher while they were students); *Doe 20 v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 5*, 680 F. Supp. 2d 957, 970 (C.D. Ill. 2010) (holding that plaintiff stated a Title IX claim where she alleged that the School District knew that the parents of three students had complained about a teacher's sexual harassment, thus raising a plausible inference that school officials knew that the teacher posed the same risk to other students). Indeed, plaintiff offers *no* case holding that a student's conduct towards a single other peer could create actual knowledge of "almost certain" harassment of others, as required to find liability under Title IX where no evidence exists of past harassment of the plaintiff.

Moreover, the evidence offered by plaintiff to show defendant's knowledge of M's most serious alleged harassment of Z is vague at best. Other than evidence that M attempted to hold Z's hand, the only evidence that any University employee knew that M had touched another student without consent came from (1) mentor Carr's 2018 statement that M had touched Doe's buttocks at the pool and that "M also did this last year," and (2) Grimyser's testimony that his

13

report accurately reflected Foster's statement to him that M had gotten in trouble in 2017 for non-consensually touching women in their intimate parts when Foster was herself a mentor.  In *Gabrielle M.*, the Seventh Circuit held that a Title IX plaintiff "cannot avoid summary judgment by asserting general allegations" of harassment.  315 F.3d at 822.  And in *Trentadue v. Redmon*, 619 F.3d 648 (7th Cir. 2010), plaintiff presented evidence that in response to a parent complaint to a school official that his step-daughter had been sexually abused by an instructor, the official said, "Well this incident has happened before, and it just in time goes away."  *Id.* at 650-51.  The court held that this evidence was insufficient for a reasonable jury to find that the school knew about the instructor's earlier abuse.  *Id.* at 653.  Even if Doe's evidence of defendant's knowledge is arguably more substantive than that presented in *Trentadue*, it is still too vague to create a triable issue.[7]

Second, even if defendant possessed the requisite knowledge, plaintiff has not created a triable issue over defendant's reactions to this alleged risk.  Once a plaintiff establishes actual knowledge, he must show that the recipient's "own deliberate indifference effectively 'cause[d]'

---

[7] There is also an important question, not raised in defendant's brief, as to whether Carr's or Foster's knowledge was adequate to establish *defendant's* knowledge.  There is no vicarious liability under Title IX, and thus the funding recipient itself -- here, the Board of Regents -- must be shown to have actual notice, and not just constructive notice, in order for liability to attach.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998).  Thus, only if a plaintiff presents evidence that "a school official with authority to take corrective measures on the Board's behalf" knew of the alleged misconduct will that knowledge be imputed to the funding recipient.  *Doe v. Bd. of Educ. of City of Chicago*, No. 19 C 00263, 2020 WL 1445638, at *3 (N.D. Ill. Mar. 24, 2020) (citing *Gebser*, 524 U.S. at 290-91).  Here, Carr was a residential mentor and there is no indication that she had the authority to take any specific disciplinary measure other than write an ISF.  Similarly, while Foster appeared to have some greater responsibility than Carr in 2018 -- she was a pre-college mentor in 2017 -- plaintiff presented no facts suggesting that she could take any actions beyond writing an ISF to Manager Hunter and meeting with the students.  Indeed, plaintiff herself notes that it was Hunter or Assistant Director Gail Ford who could choose whether to send a student home from the Summer University.  (*See* Pl.'s PFOF (dkt. #31) ¶ 24 ("With respect to choosing whether to send a student home or dismiss the student, Hunter and Ford had the discretion to determine which conduct disrupted the learning environment, thus justifying dismissal.").)  Still, because this argument was not raised by defendant, the court will not rest its decision on this principle.

the discrimination." *Davis*, 526 U.S. at 642-43 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998)) (alteration in original).  In particular, to prevail, a plaintiff must show that the "recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.*  As the Supreme Court "stress[ed]" in *Davis,* this does "not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action"; rather, school administrators must "continue to enjoy the flexibility they require," and the Court cautioned against "second-guessing" disciplinary decisions.  *Id.  See also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) (under Title IX, "victims do not have a right to specific remedial measures").

The Seventh Circuit has found a variety of responses to harassment allegations not clearly unreasonable under Title IX.  For example, in *Gabrielle M.*, the court found that defendant's responses to specific instances of misconduct -- including verbal discipline and transferring the perpetrator to a new class -- were, as a matter of law, "not clearly unreasonable," even though the perpetrator continued to have contact with the victim at lunch and recess and continued to harass her.  315 F.3d at 824.  The court explained that "*Davis* does not require funding recipients to remedy peer harassment. . . .   All that *Davis* requires is that the school not act *clearly unreasonably* in response to known instances of harassment."  *Id.* (citing *Davis*, 526 at 648-49) (emphasis in original).

Similarly, in *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014), the Seventh Circuit affirmed summary judgment for defendant on the grounds that plaintiff could not show that defendant's response to the harasser's conduct was clearly unreasonable.  *Id.* at 621-22.  There, plaintiff, a middle school student, recounted various instances of bullying by a peer, including erasing her class work, calling her names, pushing her, and ultimately chasing her with sticks and pushing her into a mud puddle.  *Id.* at 620-21.  Defendant, after each instance that they knew about, took some action, including verbally counseling the perpetrator, asking the two students to stay away

from each other, and assigning them to different study groups. *Id.* Eventually, after the chasing and mud puddle incident, defendant expelled the perpetrators. *Id.* According to the Seventh Circuit in *Galster*, "[f]ederal law gives school officials wide discretion in making disciplinary decisions, especially as they have to balance the interests of all concerned. In this case . . . the forcefulness of expulsion certainly demonstrates how seriously the defendants took the boys' bullying of Doe once they learned its full extent." *Id.* at 621.

Here, even plaintiff does not attempt to argue that defendant's reaction after receiving *Doe's* complaint on June 25, 2018, amounted to deliberate indifference. (*See* Pl.'s Opp'n (dkt. #26) 20-22.) This is prudent, as no jury could conclude that defendant's quick action in investigating Doe's complaint and sending M home from the program was "clearly unreasonable." Instead, plaintiff stakes her claim on the position that defendant failed to respond adequately to M's misconduct towards Z, putting Doe at risk.

But based on what Hunter actually knew of M's conduct towards Z in the summer of 2017, this court is unable to second guess the Board's decision to give M a stern warning in hopes that she would take it to heart, learn from her mistakes, and do better. While Hunter could have imposed harsher punishment on M in 2017, the Supreme Court cautioned in *Davis* that courts should not "second-guess[]" disciplinary decisions that are not "clearly unreasonable." 526 U.S. at 648. As for defendant's 2018 actions -- even assuming Carr had learned of Z's complaints the first week of the 2018 University program -- formal disciplinary action dismissing M from the program was taken, at the very longest, two weeks after these initial complaints. While the consequences of a one or two week delay in disciplining M was certainly regrettable in hindsight, especially for plaintiff, the court concludes that, even viewing the facts in the light most favorable to plaintiff, no reasonable jury could find that reaction was clearly unreasonable and amounted to deliberate indifference.

In *Davis*, the Supreme Court explained that "[i]n an appropriate case, there is no reason

16

why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." 526 U.S. at 649. This is such a case. Indeed, defendant's response to evidence of M's apparent continued misconduct here occurred with both dispatch and certainty. Accordingly, defendant's motion for summary judgment will be granted.

ORDER

IT IS ORDERED that defendant's motion for summary judgment (dkt. #14) is GRANTED. Defendant's motion to stay (dkt. #33) is DENIED AS MOOT.

Entered this 17th day of July, 2020.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge